IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BILLY GOFF,

      Plaintiff,                        No. CIV S-99-0652 FCD GGH

vs.

JO ANNE B. BARNHART,
Commissioner of Social
Security,

                                   FINDINGS AND RECOMMENDATIONS

      Defendant.
_____/

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). For the reasons that follow, the court recommends plaintiff's Motion for Summary Judgment or Remand be denied, the Commissioner's Cross Motion for Summary Judgment be granted, and judgment be entered for the Commissioner.

The court is concerned about the length of time it has taken to adjudicate this case. Originally filed in 1999, the case was remanded in March of 2001 when the Commissioner could not locate the administrative record. Over *three* years later the parties reappeared in district court with the record finally intact. The parties are silent about the need for such a lengthy time period to locate the record, or whether record reconstructive activities took place. Thus the evidence to

be reviewed is, at best, nearly eight years old, and in some cases decades old. This case itself is over six years old.

To compound matters, plaintiff seeks Title II benefits (in addition to Title XVI) for which he would have to demonstrate his disability as of his date last insured—September 1991. The vast amount of medical information postdates that time, and is largely irrelevant to the early period. Plaintiff's counsel realizes that there is not much hope for Title II benefits (Tr. 217), yet nevertheless persists in urging that the ALJ erred in not awarding such benefits. The sparse records would not allow any jurist to overrule the ALJ with respect to a finding of not disabled for the pre-September 1991 period, and plaintiff's later records shed little light on the pre-September 1991 time period. Thus, for practical purposes, this adjudication is limited to Supplemental Security Income benefits (Title XVI).

If plaintiff had requested it, and if the law permitted it, the court would think hard about defaulting the Commissioner for unacceptable delay in reconstructing the record. However, no request has been made, and the undersigned continues with the case. The court notes that plaintiff will be eligible for SSI, assuming he financially qualifies, on his 65th birthday (2006) regardless of his disability status.

BACKGROUND

Plaintiff, born April 12, 1941, applied for disability benefits on December 10, 1994. (Tr. at 49, 15.) Plaintiff alleged he was unable to work since June 30, 1991, due to heart disease and arthritis of the spine. (Tr. at 49, 15, 110.)

In a decision dated August 28, 1997, ALJ Robert K. Rogers, Jr., determined that plaintiff was not disabled.[1] The ALJ made the following findings:

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).

2

1. The claimant met the disability insured status requirements of the Act on June 30, 1991, the date the claimant stated he became unable to work, and continued to meet them only through September 30, 1991.

2. The claimant has not engaged in substantial gainful activity since June 30, 1991.

3. The medical evidence establishes that the claimant has severe chronic obstructive pulmonary disease, mild, and back pain, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The allegations of the claimant were not supported by the record as a whole and are incredible.

5. The claimant has the residual functional capacity to perform a full range of medium exertional level work activity. He can lift and carry 50 pounds occasionally and 25 pounds frequently. He can push and pull weights in commensurate amounts. He can sit, stand and walk each for 4 hours of an 8 hour day.

6. The claimant's past relevant work as a dishwasher or a bell ringer did not require the performance of work-related

---

A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:
  Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
  Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
  Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
  Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
  Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
  The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

3

>    activities precluded by the above limitation(s) (20 CFR 404.1565 and 416.965).
>
> 7. The claimant's impairments do not prevent the claimant from performing his past relevant work, as a dishwasher and bell ringer.
>
> 8. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(e) and 416.920(e)).

(Tr. at 22-23.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Failed to Consider Plaintiff's Cardiac or Psychiatric Impairments In Determining Whether Plaintiff Suffered from a Severe Impairment; B. Whether the ALJ Rejected Plaintiff's Credibility Without Providing Sufficient Reasons; C. Whether the ALJ's Step Four Denial Was Erroneous; and D. Whether the ALJ Erred in His Decision Regarding Plaintiff's Residual Functional Capacity.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

A. <u>The ALJ Did Not Err in Finding that Plaintiff's Cardiac and Psychiatric Impairments Were Not Severe Impairments</u>

Plaintiff first contends that in considering plaintiff's impairments at step two, the ALJ did not find plaintiff's cardiac or psychiatric impairments to be severe impairments.

At the second step of the disability analysis, an impairment is not severe only if it "would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered." SSR 85-28. The purpose of step two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 107 S. Ct. 2287 (1987). "The step-two inquiry is a de minimis screening device to dispose of groundless claims." <u>Smolen v. Chater,</u> 80 F.3d 1273, 1290 (9th Cir. 1996).

The ALJ only found plaintiff's back pain and mild chronic obstructive pulmonary disease to be severe. In regard to plaintiff's cardiac problems, the ALJ found that his cardiac function was normal, and that plaintiff was not credible. In regard to the psychiatric impairment, he found that there were no significant mental problems in the record. (Tr. at 19, 21.)

Although plaintiff apparently had a heart attack in 1984, the oldest records indicate a normal EKG with sinus tachycardia on November 14, 1989, and no cardiac changes in a cardiac profile.[2] (Tr. at 190, 201, 202.) On April 9, 1993, plaintiff reported to prison medical staff that he had angina and occasional tachycardia. (Tr. at 163, 164.) On March 6, 1995, plaintiff complained of coronary artery disease to Dr. LeSon, an internist consultant for the Department of Social Services. (Tr. at 171.) He was taking nitroglycerin for chest pain. (<u>Id.</u> at

---

[2] The records do not indicate that these impairments met the durational requirements for disability insurance benefits which would have to have been established before September 30, 1991. (Tr. at 15.)

5

171, 172.) Dr. LeSon, after examination, concluded that plaintiff had chronic low back pain and "alleged coronary artery disease with a history of a myocardial infarction in 1984." (Id. at 173.) He found a regular sinus rhythm, but no evidence of peripheral edema, and did not diagnose any heart ailment. (Id.) His functional capacity assessment did not limit plaintiff physically due to this alleged impairment. (Id. at 174-75.) An x-ray of the chest on June 8, 1995 indicated no congestive heart failure. (Id. at 177.)

Dr. Makowski, a specialist in cardiovascular medicine, wrote to plaintiff's attorney on December 16, 1996, stating that plaintiff's activity was limited by more than his cardiac problems, and that his cardiac function was normal. He proceeded to order pulmonary tests and referral to a pulmonologist. (Tr. at 268.) At this time, plaintiff was strongly advised to stop smoking, but he declined.[3] (Id.) Dr. Makowski completed an assessment of ability to do work related activities at this time, and all limitations were noted to be due to chronic obstructive pulmonary disease or emphysema. Cardiac problems were not listed as a cause. (Tr. at 269-70.) This doctor limited plaintiff to lifting a maximum of fifteen pounds occasionally, and walking two blocks due to shortness of breath. (Id. at 269.)

On May 20, 1996, plaintiff was admitted to the UCD emergency room for chest pain. (Tr. at 337.) A protocol was planned to rule out heart attack, but plaintiff left the hospital in order to smoke. (Tr. at 338.)

On November 4, 1996, plaintiff was admitted to UCD Medical Center emergency room due to chest pain for four hours. He had run out of his nitroglycerin pills several days earlier. (Tr. at 285.) It was noted that in the past, plaintiff had a quick response to this medication. (Id.) A myocardial perfusion study was done on November 5, 1996, to look for coronary artery disease. (Tr. at 313.) The conclusion was a historical large inferior wall infarction, but no evidence of myocardial ischemia. (Id. at 314.) On November 5, 1996, plaintiff

---

[3] Plaintiff was strongly advised to quit smoking several times by various specialists, but was adamant in his decision to continue smoking. (Tr. at 286, 290, 296, 339.)

discharged from the hospital early so he could smoke cigarettes, and related that he intended to continue to smoke. (Id.) The discharge diagnosis was "1. Noncardiac chest pain. 2. Coronary artery disease status post inferior wall myocardial infarction in 1984 by history. 3. Tobacco abuse. 4. Chronic obstructive pulmonary disease." (Id. at 285.)

On May 10, 1997, Dr. Leoni examined plaintiff for the Department of Social Services, pursuant to the ALJ's decision to leave the record open after hearing in order to obtain a consultative exam regarding plaintiff's lung problems and his residual functional capacity. (Tr. at 46-47.) At this time, plaintiff reported that his chest pain is resolved within three to five minutes when he takes nitroglycerin. (Tr. at 388.) He admitted there was no exertional component to the chest pain. (Id.) Dr. Leoni thought the chest pain was not the result of angina pectoris, but was atypical for angina. (Id. at 393.) The cardiovascular portion of the exam was normal. (Id. at 391.)

It is apparent that much of plaintiff's respiratory and chest pain limitations are due to his lung disease which the ALJ acknowledged was a severe impairment. To the extent that plaintiff has chest pain, it appears from the records that this condition is controlled by nitroglycerin. (Tr. at 285.) An impairment which can be controlled in this manner does not qualify as a severe impairment. Treatments which for the most part eradicate severe symptoms must be analyzed.

> In Sutton, twin sisters with severe myopia contended they were discriminated against by an airline. Id. at 475-76, 119 S.Ct. 2139. The twins wore corrective lenses which gave them vision of 20/20 or better. Id. at 475, 119 S.Ct. 2139. The Supreme Court held that the twins were not disabled. Id. at 488-89, 119 S.Ct. 2139. The disability determination does not depend upon hypotheticals such as what the twins would face if they did not wear glasses. Id. at 482, 119 S.Ct. 2139. Instead, the disability determination "depends on whether the limitations an individual with an impairment actually faces are in fact substantially limiting." Id. at 488, 119 S.Ct. 2139. In Fraser's case, we consider both artificial mitigating measures, such as insulin injections and other drugs, as well as natural mitigating measures, such as the body's natural response to cope with physical impairments.

7

1  Fraser v. Goodale, 342 F.3d 1032, 1038-1039 (9th Cir. 2002).

2  While Sutton and Fraser deal with the definition of disability under the Americans with Disabilities Act (somewhat analogous to the severe impairment concept in Social Security cases), there is no reason why the principles of those cases cannot be employed here. A Third Circuit Social Security case, which mirrors the above reasoning, is instructive to the medication issue apparent here:

> We conclude that the terms are not synonymous and that Schaudeck's disease was not "controlled by" her chemotherapy simply because it was "responding to" the treatment. We hold that "control," as used here, means that the treatment has been so successful that the disease can be considered effectively neutralized.

Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 432 (3rd Cir. 1999). Even though Schaudeck analyzed a different point on the sequential analysis than is at issue here, the principle is the same. If angina is "effectively neutralized" through medication, it should not count as a severe impairment.

In regard to plaintiff's mental impairment, the first record reflecting a diagnosis was on November 22, 1989 when plaintiff was discharged from Glenn General Hospital with a diagnosis of situational depression, among other problems. (Tr. at 221.) Plaintiff was diagnosed with mild depression in 1993 while incarcerated; however, it was believed his symptoms were situational as he had never been incarcerated previously. (Tr. at 157.) Dr. LeSon, in his functional assessment, placed no limitations on plaintiff due to mental impairment. (Tr. at 175.)

In a parole outpatient clinic psychological evaluation, dated May 16, 1995, plaintiff was diagnosed with personality disorder, not otherwise specified, with obsessive-compulsive, dependent, and passive aggressive features. (Tr. at 213.) GAF was 60.[4] (Id.) The

---

[4] GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994) ("DSM IV"). According to the DSM IV, a GAF of 60 indicates

psychologist thought plaintiff was adjusting well to being in the community after his release from prison. (Id.)

Dr. Cunningham, a consulting psychiatrist, performed a complete mental exam on June 18, 1995. She diagnosed Paraphilia, NOS, dysthymia, and antisocial personality disorder. (Tr. at 180.) The GAF score was 70, and had been 70 for the past year, according to this psychiatrist.[5] (Id. at 181.) She thought plaintiff could have a regular work schedule without supervision, but might have some difficulty interacting with others. (Id.) She opined that antidepressant medication would help plaintiff, but she did not think there would be a significant change in the near future, based on his long history. She concluded that he was functioning marginally, but adequately. (Id.)

On August 14, 1996, psychologist Park assigned plaintiff a GAF of 65. (Tr. at 214.) The only mental diagnosis was personality disorder. (Id.)

Based on these records, substantial evidence supports the ALJ's determination that plaintiff's mental impairment was not severe. The only diagnoses of depression were situational in nature and were made years earlier, during the time plaintiff was having problems adjusting to prison and his crime which were later resolved with his release and the passage of time. His most recent GAF scores reflected only mild symptoms, and these were assigned while plaintiff was without benefit of antidepressant medication which Dr. Cunningham thought would help. These records indicate that plaintiff has no severe mental impairment which would impact his functional capacity.

\\\\\

---

moderate symptoms such as flat affect, circumstantial speech, occasional panic attacks, or moderate difficulty in functioning as in few friends or conflicts with peers or co-workers.

[5] A GAF of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM IV at 32.

B. Whether the ALJ Rejected Plaintiff's Credibility Without Providing Sufficient Reasons

Plaintiff contends that the ALJ erred in discrediting his credibility without following the proper analysis.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Id. at 345-46.[6] If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[7] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally

---

[6] This does not mean, however, that the lack of objective evidence to support the pain alleged is irrelevant to the analysis.

[7] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant.  Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing.  Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

Contrary to plaintiff's assertions, the ALJ did follow the appropriate factors as outlined above.  First, he rejected plaintiff's credibility by pointing out that the record did not support plaintiff's claim that he could do no work activities.  The ALJ noted that plaintiff had worked as a bell ringer for the Salvation Army, as a dishwasher in his nephew's restaurant, and had done light duty in prison.  (Tr. at 20.)  The ALJ further observed that on multiple occasions physicians had strenuously advised plaintiff to stop smoking, but he adamantly refused in the face of shortness of breath and chest pain.  (Tr. at 21, 286, 290, 296, 339.)  Failure to follow treatment is a significant factor in the credibility analysis.  Smolen, 80 F.3d at 1284.

In regard to daily activities, the ALJ referred to the record which indicates that plaintiff lives alone and is able to take care of himself.  Plaintiff reported to Dr. Cunningham that he takes care of his personal needs, cooks, does household chores, shops and runs errands.  He gets around by walking, and sees friends.  (Tr. at 179.)  The ALJ also took note of plaintiff's report to Dr. Greenstone that he takes long walks to take his mind off things.  (Tr. at 212.)

The ALJ additionally reviewed the medical records which he concluded did not support the level of pain or incapacity as alleged.  For example, plaintiff received appropriate treatment and monitoring of his physical ailments.  (Id. at 21.)  The ALJ relied on Dr. Makowski's opinion that plaintiff had normal cardiac function.  (Id.)  The ALJ also stated that

11

"although the claimant had diastolic dysfunction, this still did not explain the claimant's dyspnea on exertion." (Id.)  The ALJ also rejected plaintiff's credibility based on the prior felony conviction. (Tr. at 22.)

The medical records support the ALJ's analysis. Plaintiff's heart condition was treated well with nitroglycerin pills, and the records for the most part indicate that he only had problems when he did not take his medication. (Tr. at 285, 337.) Dr. Cunningham, who did not diagnose depression, nevertheless thought that plaintiff would benefit from antidepressants. (Id. at 181.) In 1993, it was noted that a back brace would be very effective for plaintiff's low back pain. (Tr. at 156.) Dr. Leson examined plaintiff's back and found only mild tenderness, but decreased forward bending due to pain. (Id. at 173.) Straight leg raises were negative. (Id.) This doctor limited plaintiff functionally, but only to the extent that he could lift 50 pounds occasionally and bend and climb occasionally. (Id. at 174.) He also estimated that plaintiff could walk, stand and sit for six hours each in an eight hour day. (Id.) Although Dr. Makowski limited plaintiff to lifting 10 to 15 pounds and walking two blocks, he did so based on plaintiff's refusal to quit smoking and his history of chronic obstructive pulmonary disease and emphysema. (Tr. at 269.) Dr. Leoni thought that plaintiff could do medium work, including walking, standing or sitting two to four hours per day, lifting ten to twenty pounds frequently, and twenty to fifty pounds occasionally. Plaintiff could never lift over fifty pounds. (Tr. at 395-96.) Plaintiff was also restricted in bending, and partially restricted in climbing stairs or ladders. (Id. at 396.) Dr. LeSon interestingly described plaintiff's heart condition as "*alleged* coronary artery disease with a history of a myocardial infarction in 1984." (Id. at 173.) (emphasis added.)

Furthermore, plaintiff had not sought any regular or ongoing treatment for his ailments, but could have obtained relief from relatively mild medication and treatment (back brace, nitroglycerin, quitting smoking, and antidepressants) (Tr. at 156, 285, 286, 181), and had not participated in any significant pain regimen or therapy program. The ALJ can consider a claimant's minimal use of pain medication as a factor in evaluating credibility. See Matthews v.

12

Shalala, 10 F.3d 678, 679-80 (9th Cir.1993).

Based on the foregoing record evidence, substantial evidence supports the ALJ's credibility determination.

C. The ALJ's Assessment of Plaintiff's Residual Functional Capacity and His Decision That Plaintiff Could Do His Past Work At Step Four Is Supported by Substantial Evidence

Plaintiff asserts that the residual functional capacity reflected in the record and adopted by the ALJ is not consistent with the full range of medium work as defined in the regulations.

The ALJ found that plaintiff could do medium work because he could lift and carry fifty pounds occasionally and twenty-five pounds frequently. He could push and pull weights, and sit, stand and walk each for four hours of an eight hour day. (Tr. at 20.) The ALJ took the testimony of the vocational expert to find that plaintiff could do his past work as dishwasher which was medium work, or as bell ringer which was light work. (Id. at 21.)

In regard to the dishwasher job, medium work is defined as "lifting not more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 CFR §§ 404.1567(c); 416.967(c). Social Security Ruling 83-10 more specifically outlines the prerequisites of medium work, for which the full range requires "standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time."

Plaintiff claims the ALJ's finding that plaintiff can sit, stand and walk for four hours each is not consistent with the above regulations. Plaintiff misconstrues either the decision and/or the ruling. The ALJ found that plaintiff could perform *each* of these functions for four hours. In other words, he found that plaintiff could stand for four hours, sit for four hours and walk for four hours. The ruling only requires that the total of standing and walking comprise six hours. The ALJ's decision is entirely consistent with the ruling because it allots a total of eight

hours for standing and walking, at four hours per each activity.

In regard to the plaintiff's contention that SSR 83-10 defines medium work as including frequent bending and stooping, and Dr. LeSon found plaintiff could only occasionally bend, (tr. at 174), this ruling states that medium work *usually* requires frequent bending and stooping. SSR 83-10 (emphasis added). Dr. Leoni additionally concluded that plaintiff could do medium work, based on the guidelines submitted to him by the Department of Social Services.[8] (Tr. at 397.) He also found plaintiff to be restricted in bending but came to this conclusion nevertheless. (Id. at 396.) The ALJ relied on these two opinions to find plaintiff could do medium work.

The vocational expert testified that plaintiff's past work as bell ringer was considered light work and his past work as dishwasher was medium work. (Tr. at 46.) This court finds that substantial evidence supports the ALJ's decision that plaintiff could do his past work as dishwasher.[9]

The ALJ properly chose not to rely on Dr. Makowski's opinion which limited plaintiff's functional capacity in lifting and walking because it was based only on plaintiff's history of chronic obstructive pulmonary disease and emphysema. (Tr. at 269.) At the time Dr. Makowski limited plaintiff more severely in his functional abilities, this physician did not have the benefit of the pulmonary function tests which Dr. Leoni had at his later exam. (Tr. at 268, 393.) In fact, on December 16, 1996, Dr. Makowski stated that "although there is some evidence of diastolic dysfunction this probably will not explain the dyspnea on exertion that the patient experiences. I have therefore ordered pulmonary function tests to evaluate his pulmonary status and referred him to the pulmonologist." (Id. at 268.) In contrast, Dr. Leoni had the results of the

---

[8] This physician also found plaintiff could do the full range of sedentary work, as noted by the ALJ. (Tr. at 396.)

[9] The Commissioner concedes that plaintiff's past seasonal work as bell ringer for the Salvation Army during the Christmas season does not satisfy the durational requirements to be considered past work.

tests ordered by Dr. Makowski when he examined plaintiff on May 10, 1997. At this time, he reported:

> As far as his shortness of breath is concerned, he has diffuse rhonchi noted throughout. There is a decrease in diaphragmatic excursion. He has a pulmonary function test showing FEV-1 of 2.92 or 95% of predicted and FVC of 4.54 or 119% of predicted. Flow rate is 64%. This is interpreted as mild obstructive lung disease with response to bronchodilators.

(Id. at 393.)

These results are mild, as indicated by Dr. Leoni, and more importantly, treatable with bronchodilators. Presently treatable conditions are not susceptible to being characterized as a long term disability. Henry v. Gardner, 381 F.2d 191 (6th Cir. 1967) (smoking case); Fletcher v. Califano, 471 F.Supp. 317 (N.D.Texas 1977) (smoking case).

> Failure to quit smoking has been held to be a justifiable grounds for refusing benefits. E.g., Henry v. Gardner, 381 F.2d 191 (6th Cir.1967); Hirst v. Gardner, 365 F.2d 125 (7th Cir.1966). However, some recent cases have held that benefits cannot be denied for failure to stop smoking absent a finding that the claimant could voluntarily stop smoking (i.e., was not addicted to cigarettes). Monteer v. Schweiker, 551 F. Supp. 384, 390 (W.D.Mo.1982); Caprin v. Harris, 511 F. Supp. 589, 590 (N.D.N.Y.1981). Smoking, like alcohol abuse, can be an involuntary act for some persons. We believe that allegations of tobacco abuse should be treated in the same fashion as allegations of alcohol abuse.

Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984).

The court held that on remand, benefits could only be denied if there was a finding that a physician had prescribed cessation of smoking, and the claimant was able to voluntarily stop. (Id.) See also Byrnes v. Shalala, 60 F.3d 639 (9th Cir. 1995) (noting that before ALJ can deny benefits for noncompliance with prescribed treatment such as smoking, he must consider whether impairment is reasonably remediable by the individual claimant).

Therefore, although it is questionable whether plaintiff could voluntarily stop smoking, there is no question that his shortness of breath could be treated with bronchodilators and other medication.

Furthermore, although Dr. Makowski may have been considered a treating doctor, he was a sporadic treating source at best. The record reflects that he may have seen plaintiff only a handful of times. Therefore, the fact that the ALJ did not specifically reject him was harmless error based on the reasons set forth above. An error which has no effect on the ultimate decision is harmless. Curry v. Sullivan, 925 F.2d 1127, 1121 (9th Cir. 1990).

CONCLUSION

The court finds the ALJ's assessment to be fully supported by substantial evidence in the record and based on the proper legal standards. Accordingly, IT IS RECOMMENDED that plaintiff's Motion for Summary Judgment or Remand be denied, the Commissioner's Cross Motion for Summary Judgment be granted, and Judgment be entered for the Commissioner.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within ten (10) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten (10) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 7/1/05

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Goff0652.ss.wpd